# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARK D. SITTER**
        **Plaintiff,**

    **v.**                                    **Case No. 16-C-692**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

In this action for judicial review, plaintiff Mark Sitter contends that the Social Security Administration ("SSA") improperly denied his application for disability benefits. Specifically, he contends that the Administrative Law Judge ("ALJ") who heard the case overlooked important medical evidence, failed to develop a full and fair record, did not build an accurate and logical bridge from the evidence to his conclusions, and relied on flawed vocational testimony regarding jobs plaintiff could still perform. I agree that the matter must be remanded given apparent flaws in the vocational evidence.

## I. FACTS AND BACKGROUND

### A.    Medical Evidence

Plaintiff based his disability claim on injuries to his right ankle and right shoulder suffered while working in a grocery store warehouse, as well as some residual cognitive issues that arose after one of his shoulder surgeries. I first review the medical evidence, then the administrative proceedings in the case.

### 1. Ankle

On October 16, 2003, plaintiff suffered a crush injury to his right ankle. The fracture was treated with an open reduction/internal fixation ("ORIF"), but he continued to experience some residual effects. Plaintiff saw Dr. Armen Kelikian on August 30, 2005, complaining of ankle pain and sensory deficit. (Tr. at 353.) Dr. Kelikian obtained a CT scan, which revealed synastosis from the original injury.[1] (Tr. at 353-54.) Dr. Kelikian recommended arthroscopic surgery, which was performed on January 10, 2007. Plaintiff's post-operative course was unremarkable. He returned to Dr. Kelikian on October 21, 2008, with x-rays showing some mild joint space narrowing; Dr. Kelikian advised that he may need the plate removed. On February 3, 2009, plaintiff underwent arthroscopic surgery, with hardware removal and debridement. His post-operative course was again unremarkable. On July 7, 2009, Dr. Kelikian reported that plaintiff had reached maximum medical improvement following the February surgery. His gait was unremarkable, and he had returned to work. Dr. Kelikian suspected that plaintiff might need future arthroscopic surgery, but he did not anticipate a major reconstructive procedure. (Tr. at 354.) Dr. Kelikian noted that plaintiff had no permanency or restrictions at that point. (Tr. at 352.)[2]

On February 2, 2010, plaintiff returned to Dr. Kelikian, noting some increasing soreness in his right ankle more recently, since about Christmas. On exam, he had full range of motion, and x-rays showed no significant interval change. Dr. Kelikian recommended plaintiff take non-

---

[1]Synastosis is the fusion of normally separate skeletal bones. http://medical-dictionary.thefreedictionary.com/synostosis.

[2]On October 13, 2009, Dr. Kelikian reviewed radiographs, which revealed no gross abnormalities, except synastosis. (Tr. at 350.)

steroidal anti-inflammatory drugs ("NSAIDs") and provided an ankle sleeve; if the ankle did not improve, he would provide an injection. (Tr. at 349.) On March 9, plaintiff still had some discomfort in the right ankle. X-rays showed minimal arthritic changes. He was to return in two months, perhaps for an injection, and continue on Flector patches.[3] (Tr. at 348.) On May 11, Dr. Kelikian found plaintiff to be doing well, with minimal discomfort. He recommended Voltaren gel.[4] If the pain did not improve, he would provide an injection. (Tr. at 347.) On May 11, 2011, Dr. Kelikian injected plaintiff's right ankle. He recommended no further surgery. (Tr. at 346.)

The record also contains reports from a Dr. George Holmes, who evaluated plaintiff's ankle injury for the workers' compensation insurance carrier. (Tr. at 362-80.) In December 2011, Dr. Holmes noted that while plaintiff continued to have some mild pain and sensitivity, overall he was doing well, working full-time, discharged from the care of Dr. Kelikian. He had some limitations, only being able to walk three to four hours at a time and stand for three to four hours at a time; he took Tylenol on an as-needed basis. (Tr. at 362.) Dr. Holmes opined that plaintiff needed no further medical care for his right ankle (Tr. at 363) and saw no objective reason why plaintiff could not work 40, 50, or 60 hours per week (Tr. at 367).

## 2. Shoulder

On February 8, 2012, plaintiff injured his right shoulder at work while lifting boxes over shoulder height, feeling a sharp pop or pull. Therapy did not improve his condition so he saw Dr. Joshua Gershtenson, an orthopedic surgeon, on March 14, 2012. Plaintiff reported

---

[3]Flector patches contain the NSAID diclofenac and are used to treat pain caused by minor sprains, strains, or bruising. https://www.drugs.com/flector.html.

[4]Voltaren gel also contains diclofenac. https://www.drugs.com/voltaren-gel.html.

increased pain from lifting his arm forward, alleviated by disuse.  An MRI showed a full thickness tear at the supraspinatus with retraction to the articular surface.  (Tr. at 384.)  Dr. Gershtenson assessed a work-related right rotator cuff tear and biceps tenosynovitis, recommending surgery.  Until then, plaintiff was to remain on light duty with a 10 pound lifting restriction.  Dr. Gershtenson saw no evidence of malingering during the course of the evaluation.  (Tr. at 383.)

On April 19, 2012, Dr. Gershtenson performed a right shoulder arthroscopy with subacromial decompression and rotator cuff repair.  (Tr. at 654-57.)   On May 2, plaintiff returned for follow-up, describing aching more than actual pain.  On exam, he had mild swelling.  He denied the need for pain medication.  Dr. Gershtenson kept him off work until seen again on one months' time.  (Tr. at 381.)  On May 30, Dr. Gershtenson noted improved range of motion on exam, but still significantly limited, along with obvious strength deficits.  (Tr. at 645.)

Plaintiff subsequently participated in physical therapy but improved little, with continued difficulty sleeping, showering and dressing, reaching to shoulder height and above, and lifting objects secondary to pain.  (Tr. at 476, 512, 521.)  On July 18, 2012, Dr. Gershtenson noted active forward elevation to less than 90 degrees.  He assessed a poor early outcome following the rotator cuff repair and arthrofibrosis.[5]   Given his lack of progress, Dr. Gershtenson recommended a right shoulder manipulation under anesthesia (Tr. at 643), which he performed on July 26 (Tr. at 809), after which therapy resumed (Tr. at 522, 533, 546.)  On August 8, Dr. Gershtenson noted significant improvement in range of motion; plaintiff was to continue in

_____

[5]Arthrofibrosis is a complication of injury or trauma where an excessive scar tissue response leads to painful restriction of joint motion. https://en.wikipedia.org/wiki/Arthrofibrosis.

physical therapy and remain off work. (Tr. at 641.) On August 29, Dr. Gershtenson indicated plaintiff was coming along slowly but surely. He kept plaintiff off work given the long drive required. (Tr. at 710.) In September 2012, plaintiff advised his therapist of some improvement following the manipulation but not as much as expected; he continued to have trouble reaching overhead. (Tr. at 626, 667.)

A September 19, 2012, occupational assessment showed bilateral lifting of 20 pounds, frequent bilateral lifting of 16 pounds, and bilateral shoulder lifting of 16 pounds. Plaintiff demonstrated the ability to perform 44.3% of the physical demands of his job in the warehouse. His abilities at that time fell within the light range under the Dictionary of Occupational Titles ("DOT"). (Tr. at 663.)

On September 26, 2012, plaintiff returned to Dr. Gershtenson, reporting increasing range of motion and decreasing pain. He did describe a catching or clicking sensation in the shoulder. On exam, his range of motion was markedly improved compared to his pre-manipulation status. There was still crepitation with internal and external rotation of the shoulder,[6] but his strength deficits were improving. Dr. Gershtenson suggested range of motion and strengthening exercises; if not improved in four weeks time, they would obtain an MR arthrogram. In terms of work, Dr. Gershtenson did not believe it wise for plaintiff to be driving several hours a day to and from work. Therefore, he recommended plaintiff stay off work until the next visit. Dr. Gershtenson also refilled plaintiff's pain medication, which he continued to take several times per day. (Tr. at 700.)

During an October 9, 2012, physical therapy evaluation, plaintiff reported 50%

---

[6]Crepitation is a dry, crackling sound or sensation, like that produced by the grating of the ends of a bone. http://medical-dictionary.thefreedictionary.com/crepitation.

improvement since his April 19, 2012 surgery.  He continued to have difficulty reaching to high shelves and pushing with his right arm.  (Tr. at 722.)

An October 18, 2012, right shoulder arthrogram revealed a full thickness tear of the supraspinatus tendon with retraction, partial thickness tearing along the bursal surface of the distal infraspinatus tendon, surgical changes from a biceps tenodesis, and mild ostreoarthritis changes of the glenohumeral joint.  (Tr. at 804.)  On October 24, plaintiff advised Dr. Gershtenson of slight improvement since the last visit.  He continued to have pain with activities above shoulder height.  Physical exam was not markedly changed except in terms of motion. He continued to have crepitation with internal and external rotation.  Review of the MRI showed that the partial repair of the supraspinatus had failed.  (Tr. at 706, 714.)  Dr. Gershtenson recommended continued therapy; in the meantime, he would discuss the case with one of his partners and get another opinion in terms of whether a repeated attempt at rotator cuff repair was indicated.  He did not think plaintiff could return to his past job.  (Tr. at 706.)

An October 24, 2012, occupational assessment showed bilateral lifting of 30 pounds, frequent bilateral lifting of 16 pounds, and bilateral shoulder lifting of 20 pounds.  Plaintiff demonstrated the ability to perform 53.4% of the physical demands of his job in the warehouse, an increase from 44.3% at the September 12, 2012 evaluation.  His abilities fell within the light range under the DOT, while his job in the warehouse was classified as heavy.  (Tr. at 719.) A November 20, 2012, occupational assessment showed bilateral lifting of 40 pounds, frequent bilateral lifting of 30 pounds, and bilateral shoulder lifting of 25 pounds.  At that point, plaintiff demonstrated the ability to perform 69.1% of the physical demands of his job in the warehouse. (Tr. at 717.)

On November 21, 2012, plaintiff advised Dr. Gershtenson of increasing range of motion;

6

however, he still described strength deficits. Physical exam showed his active range of motion to be near full, but there was still some crepitation with forward elevation. Strength testing showed mild diminished abductor strength, as well as internal rotation strength deficits. Dr. Gershtenson indicated that further attempts at repair of the supraspinatus were likely to be unsuccessful and recommended plaintiff obtain a second opinion outside his group. (Tr. at 704.)

In December 2012, plaintiff advised his therapist of 55% improvement since the April 19, 2012 surgery. He continued to have difficulty reaching overhead, lifting and carrying, and pushing open a heavy door. (Tr. at 828.) In January 2013, he advised the therapist of 60% improvement. Right shoulder weakness continued as his main complaint. (Tr. at 839, 848, 857.)

On January 2, 2013, plaintiff saw Dr. William Pennington for a second opinion. On exam, rotator cuff strength with forward flexion and abduction was limited due to pain and weakness. There was tenderness over the anterior superior shoulder region and positive impingement signs. The remaining limbs revealed full range of motion, adequate strength, and no sign of neurovascular compromise. Cervical and lumbar spine evaluation also revealed full range of motion, normal alignment, and no radicular provocation signs. The updated MRI revealed a large tear of the supraspinatus as well as a portion of the infraspinatus with retraction. (Tr. at 815.) Dr. Pennington presented options of continued conservative care to try to maximize the shoulder versus performing an attempted revision of the rotator cuff tear. He noted that the tear was large and the tissue quite "wispy," which likely contributed to the original repair not healing. (Tr. at 816.)

On February 13, 2013, plaintiff advised his therapist of 65% improvement. He continued

to have difficulty with overhead and out to the side reaching. (Tr. at 868.)

On February 22, 2013, Dr. Pennington performed a right shoulder arthroscopy with rotator cuff repair. (Tr. at 881.) On March 1, plaintiff was seen by Joann Pitton, P.A.-C, for follow up, complaining of some discomfort, managed appropriately by analgesics. On exam, passive motion was appropriately stiff. He was instructed to avoid active motion of the shoulder. (Tr. at 812.)

In July 2013, plaintiff returned to physical therapy. (Tr. at 1206.) On August 21, he saw Dr. Pennington and Brian Bartz, P.A.-C, complaining of some slightly increased pain during work conditioning. On exam, passive motion was smooth. He did have loss of internal and external rotation. Forward flexion and abduction strength were mildly reduced from the prior exam as well. X-rays showed evidence of some inferior humeral remodeling and narrowing of the glenohumeral space with no obvious bony changes surrounding the rotator cuff repair. He was to continue in work hardening. If he failed to notice any benefit with anti-inflammatories and continued therapy they would consider an MRI scan to evaluate for recurrent pathology. (Tr. at 1265.)

An August 22, 2013, therapy note indicated that plaintiff continued to make steady gains with shoulder strength, but pain continued to challenge him with certain movements. (Tr. at 1221.) A September 3 occupational assessment showed bilateral lifting of 40 pounds, frequent bilateral lifting of 30 pounds, and bilateral shoulder lifting of 30 pounds. At that point, plaintiff demonstrated the ability to perform 74.3% of the physical demands of his job in the warehouse, with his abilities falling in the medium range under the DOT. (Tr. at 919.)

On September 25, 2013, plaintiff saw PA Pitton in the absence of Dr. Pennington, reporting he was no better, still having pain and decreased range of motion. An MRI showed

evidence of a large, full-thickness rotator cuff tear. (Tr. at 1267; 1292-93.) "He is quite miserable with where he is at." (Tr. at 1267.) They discussed that his only option at that point would be surgery. (Tr. at 1267.) If he had surgery, it would be total shoulder arthroplasty with rotator cuff repair. (Tr. at 1268.)

On October 4, 2013, plaintiff continued to complain of pain and weakness. He decided to have the surgery with Dr. Pennington.[7] (Tr. at 1270.) However, it appears that he did not immediately proceed, next seeing Dr. Pennington and PA Bartz on March 12, 2014, indicating that his symptoms had worsened over the past few months. He continued to struggle with pain, stiffness, loss of function, and loss of strength. On exam, passive range of motion of the right shoulder had mild crepitus and was limited in all planes. Rotator cuff strength with forward flexion as well as external rotation was significantly reduced, consistent with his rotator cuff pathology. (Tr. at 1273.) Three views of the right shoulder demonstrated significant narrowing of the glenohumeral space with an inferior osteophyte projecting from the humerus as well as the glenoid, consistent with sequelae of his chondral injuries. (Tr. at 1273-74.) Dr. Pennington again recommended surgery. (Tr. at 1274.)

On August 7, 2014, plaintiff was seen for a pre-operative exam, with decreased range of motion and mildly diminished strength in the right shoulder. He did have good bilateral grip strength. (Tr. at 1306-09.)

On August 26, 2014, Dr. Penningtom performed a right total shoulder arthroplasty. (Tr. at 906.) Doctors could not wake plaintiff after the procedure (Tr. at 1312), calling a "code 4"

---

[7]According to an October 13, 2013, occupational therapy discharge summary, plaintiff attended 25 sessions, canceling none. Therapy was discontinued at that time, as plaintiff was scheduling a total right shoulder surgery. (Tr. at 922.)

as he was near respiratory arrest  (Tr. at 1314).  He was transferred to the intensive care unit and during this time his mental status improved.  (Tr. at 1312, 1314.)  Doctors seemed unclear of the cause of plaintiff's unresponsiveness.  (Tr. at 1313, 1315.)

On September 5, 2014, plaintiff saw PA Pitton for follow up, complaining of some discomfort, managed appropriately by analgesics.  On exam, passive motion was appropriately stiff.  He was instructed to have only gentle active motion of the shoulder; passive motion was fine.  He was given a referral for physical therapy and a refill of Percocet.[8]  (Tr. at 901.)  On October 15, plaintiff reported that his pain, stiffness, and overall discomfort seemed to be improving.  On exam, passive range of motion was acceptable, active range of motion improving.  He was to continue physical therapy.  (Tr. at 903.)  On November 24, plaintiff reported doing OK, complaining of some weakness.  On exam, passive motion was smooth.  He did have some weakness with forward flexion and abduction, which was not a surprise given he had a rotator cuff repair in conjunction with total arthroplasty.  X-rays revealed intact arthropasty with no evidence of dislocation.  He was to continue in physical therapy and light duty work restrictions.  (Tr. at 905.)

A December 23, 2014, occupational assessment showed bilateral lifting of 30 pounds, frequent bilateral lifting of 17 pounds, bilateral carrying of 25 pounds, and bilateral shoulder lifting of 15 pounds.  At that time, plaintiff demonstrated the ability to perform 35.3% of the

---

[8]Plaintiff participated in physical therapy from September 10, 2014, to February 20, 2015.  (Tr. at 925-76, 978-1021, 1024-77.)  The therapy notes generally indicate that plaintiff made some progress but continued to have limited range of motion and weakness above shoulder level.  (E.g., Tr. at 976, 1017, 1049.)  At the conclusion of therapy, plaintiff advised that anything above shoulder height was difficult, especially with weight.  (Tr. at 1077.)  He also had trouble reaching behind his back to get his wallet or belt, reaching behind his neck, and pointing things out with his right hand.  (Tr. at 1077-78.)  He had not attempted heavier chores at home since the injury.  (Tr. at 1078.)

physical demands of his job in the warehouse.  (Tr. at 1022.)

On January 12, 2015, plaintiff saw Joann Pauli, P.A.-C in the absence of Dr. Pennington, doing well.  On exam, passive range of motion of the right shoulder was acceptable.  Active forward flexion and abduction were assessed, and motion in these planes was acceptable for this stage of healing.  Strength was much improved.  He was instructed to continue physical therapy with progression to the endurance phase of strengthening.  His work restrictions were increased to no repetitive/one-pound overhead bilaterally, 15 pounds below shoulder level with the right.  (Tr. at 1284, see also Tr. at 900.)

On February 23, 2015, plaintiff started a work hardening/conditioning program.  (Tr. at 1082-83.) During the initial evaluation, plaintiff indicated that after his August 26, 2014 surgery, he "coded" and was in the ICU for a day.  He stated that his memory had been "foggy since then."  (Tr. at 1077.)  He was to follow up with his primary care doctor about this on February 27, 2015.[9]  (Tr. at 1077.)  He participated in the conditioning program until March 23, 2015  (Tr. at 1084-1137), continuing to have difficulty with lifting and reaching above shoulder height (e.g., Tr. at 1087, 1100, 1111, 1113, 1137).  At a March 23, 2015, re-evaluation, plaintiff demonstrated the physical capabilities and tolerances to function at the medium physical demand level, meeting 10 of 23 job demands.  (Tr. at 1135.)

On March 25, 2015, plaintiff re-commenced work hardening/conditioning (Tr. at 1139), continuing to report overhead reaching deficits (Tr. at 1140, 1165).  At an April 13 re-

---

[9]On February 27, 2015, Dr. Jeffrey Trimark initiated a work up of plaintiff's post-operative memory loss, including an MRI of the brain, to rule out post op stroke or early dementia.  (Tr. at 1252-53.)  Plaintiff's exam was otherwise normal.  "The patient is active and healthy with no adverse health habits."  (Tr. at 1252.)  On review of systems, Dr. Trimark noted normal cognition, alert and oriented x3, and normal mood and affect. (Tr. at 1256.)  A March 30, 2015, MRI of the brain was unremarkable.  (Tr. at 1260.)

evaluation, he again demonstrated the physical capabilities and tolerances to function at the medium level, but this time met just 8 of 23 job demands, a decrease from the March 23 evaluation. (Tr. at 1163.)

On April 20, 2015, plaintiff saw Dr. Trimark to review the March 30 MRI results, which were normal. Plaintiff indicated that he still had issues with not recalling discussions from the previous day. He was doing work around the house but did not finish tasks. Dr. Trimark assessed memory loss, with no abnormalities on MRI or labs, and no evidence of depression. Dr. Trimark decided to refer plaintiff for neuropsych testing.[10] (Tr. at 1246.)

On April 22, 2015, plaintiff saw PA Pauli in the absence of Dr. Pennington, reporting that he was not making much progress. He had maxed out his physical therapy and was still quite frustrated as he was very limited with strength. On exam, passive range of motion of the right shoulder was smooth; rotator cuff strength with forward flexion and abduction was limited due to weakness and pain. There was tenderness over the anterior superior shoulder region and positive impingement signs. PA Pauli was concerned about a recurrent rotator cuff tear and so ordered a CT arthrogram. (Tr. at 1285.) The May 4 CT scan showed a recurrent tear of the rotator cuff. (Tr. at 1286, 1296.)

On May 20, 2015, plaintiff saw Dr. Pennington and PA Pauli, receiving three options regarding the recurrent rotator cuff tear: (1) live with it, although quite limited with his function; (2) undergo surgery with hopeful rotator cuff repair; and (3) undergo surgery for superior capsular reconstruction. He would consider these options. (Tr. at 1337.)

---

[10]The record does not contain the results of any such testing.

**B.     Administrative Proceedings**

    **1.     Application and Supporting Materials**

In May 2012, plaintiff applied for disability benefits, alleging a disability onset date of April 18, 2012.  (Tr. at 219.)  He reported working in the supermarket warehouse from April 1982 to April 18, 2012.  (Tr. at 255.)  The job involved filling product orders to be shipped to area stores and required lifting up to 80 pounds.  (Tr. at 256.)  In a function report, plaintiff indicated that his right leg got sore after several hours on his feet, and that he had limited use of his right arm.  (Tr. at 275.)  He wrote that on a typical day he got up, ate breakfast, went to physical therapy (three times per week), shopped (once or twice per wee), cooked dinner, then watched TV until bedtime.  He reported that he could no longer engage in activities like riding a bike, skiing, jogging, or going on long hikes.  He also reported trouble sleeping (because he could not get comfortable), dressing (pulling a shirt over his head), and washing (with his right arm).  (Tr. at 276.)  He did housework such as cleaning, laundry, and light household repairs. (Tr. at 277.)  He went out two three times per day, driving a car, and shopped in stores once or twice per week.  (Tr. at 278.)  He indicated that his right leg got sore if he did a lot of squatting, standing, walking, or stair climbing.  It was also hard to lift and reach for objects due to his right shoulder injury.  He could walk for one mile before he needed to stop and rest.  (Tr. at 280.)  He noted no problems paying attention, following instructions, and handling stress. (Tr. at 280-81.)

In a physical activities addendum, plaintiff indicated that he stood 5'9" tall and weighed 170 pounds.  He slept four to five hours per night due to problems getting comfortable.  He indicated that he could stand for three to four hours and walk for three to four hours without a

break.  (Tr. at 283.)

The agency denied plaintiff's application initially on October 29, 2012, relying on the opinion of consultant Syd Foster, D.O., who reviewed the record and opined that plaintiff could perform light work with limited overhead reaching on the right.  (Tr. at 71-81, 97.)  Plaintiff sought reconsideration (Tr. at 101), but on May 7, 2013, the agency maintained the denial, relying on the opinion of consultant Janis Byrd, M.D., that plaintiff could perform light work, with no climbing of ladders, ropes, and scaffolds, and limited reaching overhead on the right (Tr. at 82-94, 102).

Plaintiff then requested a hearing before an ALJ.  (Tr. at 106.)  In a disability report-appeal, he indicated that he had undergone a second surgery, with some improvement, but still had popping and clacking in the shoulder.  He reported weakness in the shoulder and lack of confidence in doing daily tasks.  (Tr. at 307.)

### 2.    Hearing

On June 16, 2015, plaintiff appeared without counsel for his hearing before the ALJ. The ALJ advised plaintiff of his right to representation, but plaintiff elected to proceed pro se.[11] (Tr. at 31.)  The ALJ also summoned a vocational expert ("VE") to the hearing.  (Tr. at 28.)

#### a.    Plaintiff

Plaintiff testified that he was 5'9" tall, 170 pounds, and left handed.  (Tr. at 35-36.)  He lived with his wife, who was employed.  He indicated that he had a driver's license and drove to the hearing that day.  He was a high school graduate with one year of college.  (Tr. at 36.)

---

[11]The ALJ had previously continued the hearing to allow plaintiff time to collect additional medical records and obtain representation.  (Tr. at 68.)  Plaintiff makes no claim that the ALJ failed to conduct a proper colloquy concerning his right to representation.

14

From April 1982 to April 17, 2012, he worked in the warehouse at Jewel Foods; he last worked on April 17, 2012, just before his first shoulder surgery. (Tr. at 37-38.)  He indicated that the job required him to lift up to 85 pounds.  (Tr. at 38.)  He testified that he could no longer do this job due to the lifting, some at shoulder height and above.  (Tr. at 39.)  He indicated that he could not work other jobs because of his limited schooling and lack of computer knowledge; he had worked in a warehouse for 30 years.  (Tr. at 40.)

Plaintiff testified that he experienced pain in the front part of the shoulder, a dull ache, which worsened if he was active.  Medications helped.  (Tr. at 40.)  Plaintiff indicated that his shoulder hurt with household activities like yard work, changing the oil in his car, or washing his car.  When he stopped, the pain subsided.  (Tr. at 41.)  He rated the pain at a 2 on a 1-10 scale.  He had a prescription for Tramadol,[12] which he tried to take sparingly, about once per week.  He has previously taken Meloxicam.[13]  (Tr. at 42.)  He denied using over-the-counter medications.  (Tr. at 42-43, 44.)

Plaintiff testified that Dr. Pennington was his orthopedic surgeon and Dr. Trimark his general practitioner.  He saw Dr. Trimark for memory loss after his surgery on August 26, 2014, during which he "coded" and woke up in the ICU.  After that, he experienced confusion – "things just are not clear" – and had a hard time expressing himself.  (Tr. at 43-44.)  Dr. Trimark told plaintiff to go for a brain scan, which he had done.  The ALJ paused the hearing and was able to locate the record.  (Tr. at 44.)

Plaintiff testified that he had three rotator cuffs repairs and a shoulder manipulation (for

---

[12]Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. https://www.drugs.com/tramadol.html.

[13]Meloxicam is an NSAID.  https://www.drugs.com/meloxicam.html.

which he was put under anesthesia). The last surgery was a shoulder cuff repair and total shoulder replacement. He went to physical therapy, which got him to the point where he was; they stopped therapy because they felt he was at the highest point they could reach. (Tr. at 45.) He tried to stay active as much as he could but no longer engaged in activities like skiing, riding a motorcycle, and shooting. (Tr. at 46.) He reported no problems walking. He had a 30 pound lifting restriction (below the waist), with no repetitive lifting overhead. (Tr. at 47.) The ALJ asked plaintiff to lift his right arm over his head, and plaintiff was able to raise it 3/4 of the way up. (Tr. at 48.) Plaintiff indicated that he could pick objects up from a table, crawl, bend from the waist, and crouch. He briefly took medication for depression, but it made things worse so he stopped. (Tr. at 49.)

Plaintiff testified that on a typical day he got up, let the dog out, did some laundry or household chores like dishes, cooking, and cleaning, ran errands, and did gardening or mowed the lawn. He no longer hunted and rarely went fishing. (Tr. at 50.)

### b. VE

Before gathering information on plaintiff's past employment and other jobs he might be able to do, the ALJ asked the VE to advise of any testimony in conflict with the DOT and of the basis for his opinion; the VE agreed. (Tr. at 52.) The VE identified plaintiff's past work as a warehouse worker as unskilled, medium work generally, heavy as plaintiff performed it. (Tr. at 53-54.) The ALJ then asked a hypothetical question, assuming a perform of plaintiff's age, education, and experience, capable of light work (lifting 20 pounds occasionally, 10 pounds frequently; standing/walking for six hours in an eight-hour workday, sitting for two); able to frequently climb ramps or stairs but never ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; reaching bilaterally fully extended frequently, overhead on the

16

left fully extended frequently and on the right between ½ to 3/4 extended occasionally; and constantly handle objects. (Tr. at 54.) The VE testified that such a person could not perform plaintiff's past work but could perform other jobs, with a good 80% of the unskilled, light duty jobs remaining. (Tr. at 54-55.) He identified three examples: cashier, parking lot (DOT # 211.462-018), 198,000 jobs nationally; cashier, self-service (#211.462-010), 398,000 jobs nationally; and shipping/receiving weigher (#222.387-074), 187,000 jobs nationally. (Tr. at 55.) Adding a restriction of no exposure to unprotected heights and excessive vibration would not affect the identified jobs. Adding a restriction of never reaching overhead on the right would erode the shipping/receiving jobs by about 50% but would have no impact in the cashier jobs. (Tr. at 56.) The VE indicated that his testimony was in accordance "with the DOT or other resources." (Tr. at 55, 56.) Plaintiff asked the VE no questions. (Tr. at 56.)

### 3. ALJ's Decision

On September 4, 2015, the ALJ issued an unfavorable decision. (Tr. at 10). Following the required five-step analysis,[14] the ALJ determined at step one that plaintiff had not worked since April 18, 2012, the alleged onset date, and at step two that he suffered from the severe impairments of right shoulder degenerative joint arthritis status post two surgeries and history of right ankle fracture with instrumentation. (Tr. at 15.) At step three, the ALJ determined that neither of these impairments met or equaled a Listing under Section 1.00, et seq., the musculoskeletal system, stating: "The medical evidence does not document listing-level

---

[14]Under this test, the ALJ asks: (1) whether the claimant is currently working; (2) if not, whether he suffers from any severe impairments; (3) if so, whether any of those impairments meet or medically equal the requirements of one of the conclusively disabling impairments listed in the regulations; (4) if not, whether the claimant has the residual functional capacity ("RFC") to return to past relevant work; and (5) if not, whether he can make an adjustment to other work in the national economy. 20 C.F.R. § 404.1520(a)(4).

severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination. The record is devoid of evidence of an inability to perform fine/gross movements or inability to ambulate effectively." (Tr. at 15.)

Prior to step four, the ALJ determined that plaintiff retained the RFC for a restricted range of light work: lift/carry or push/pull 20 pounds occasionally, 10 pounds frequently; stand/walk and sit six hours in an eight-hour workday; frequently reach in all directions with his dominant (left) arm; unable to perform overhead reaching but occasionally reaching in other directions with his right arm; never climb ladders or scaffolds; frequently stoop, crouch, crawl, and climb stairs; and avoid all exposure to unprotected heights or vibration. In making this finding, the ALJ indicated that he had considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 16.)

In considering plaintiff's symptoms, the ALJ noted the required two-step process, under which he first had to determine whether plaintiff suffered from medically determinable impairments that could reasonably be expected to produce the symptoms. Second, if such an impairment had been shown, the ALJ had to evaluate the intensity and persistence of the symptoms to determine the extent to which they limited plaintiff's functioning. If plaintiff's statements were not substantiated by objective medical evidence, the ALJ had to make a finding on the credibility of the statements based on the entire record. (Tr. at 16.)

Plaintiff complained of right shoulder, leg, and ankle problems. Despite having surgery on his right shoulder, he continued to experience right shoulder weakness. He believed his

combination of impairments made him unable to work.[15]  The ALJ stated: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 16.)

In support of this finding, the ALJ summarized the medical evidence.  In October 2003, plaintiff fractured his ankle while working as a warehouseman.  Shortly thereafter, he underwent an open reduction internal fixation.  Although he returned to full-time employment, he continued to complain of some pain and swelling.  In January 2007, he had an arthroscopy.  Although surgery increased his flexibility, he experienced pain with weight-bearing activities.  In February 2009, the hardware was removed.  Three months later, he returned to full-time work.  In December 2011, Dr. Holmes determined that plaintiff needed no further medical management for his right ankle and saw no objective reason why plaintiff could not work 40, 50, or 60 hours per week.  (Tr. at 16-17.)

In February 2012, plaintiff injured his right shoulder at work.  He attended physical therapy without improvement.  In April 2012, he underwent surgical repair of his right biceps and labral tear with Dr. Gershtenson.  He subsequently developed arthrosis and underwent manipulation.  He made significant improvements in his range of motion, but it was still limited.  A September 2012 physical therapy note indicated plaintiff was able to perform bilateral lifting of 20 pounds occasionally and 16 pounds frequently, and bilateral shoulder lifts of 16 pounds.

---

[15]The ALJ also noted that plaintiff submitted function reports in support of his disability application, indicating that he lived in a house with his family.  He was able to prepare meals daily, do light housecleaning and laundry.  When he went out, he traveled by walking, driving, and riding in a car.  He shopped in stores once per week.  (Tr. at 17.)

19

An October 2012 MRI revealed a complete tear of the supraspinatus tendon and a partial tear of the distal infraspinatus tendon. In a November 2012 follow-up, plaintiff described increasing range of motion. However, he still described strength deficits. Dr. Gershtenson noted mild diminished abductor strength along with external rotation deficits with the arm abducted to the side. The doctor indicated that further attempts at repair were likely to be unsuccessful, and he suggested plaintiff get a second opinion from outside his group. (Tr. at 17.)

In January 2013, plaintiff obtained a second opinion from Dr. Pennington. On exam, passive range of motion of the right shoulder was smooth, rotator cuff strength was limited due to pain and weakness, and there was tenderness over the anterior shoulder region with positive impingement signs. Plaintiff had full range of motion of the spine and his other extremities. Dr. Pennington recommended rotator cuff revision. In February 2013, he performed arthroscopic rotator cuff repair and sub-acromial decompression on the right shoulder and referred plaintiff for physical therapy. (Tr. at 17.)

On August 7, 2014, plaintiff attended a pre-operative evaluation for further shoulder surgery. He had decreased motion of the right shoulder and mild diminished strength. Grip strength in both hands was normal. On August 26, 2014, plaintiff had total arthroplasty with open rotator cuff repair of the right shoulder. He was diagnosed with severe degenerative glenohumeral arthritis. (Tr. at 17.)

In February 2015, plaintiff attended a yearly physical exam with Dr. Jeffrey Trimark. He reported normal cognition and independence with activities. He complained of right shoulder pain on a scale of 2 out of 10. The exam was otherwise normal. (Tr. at 17.)

On May 4, 2015, a CT arthrogram of the right shoulder revealed a rotator cuff tear in the sub-deltoid burse. There was no sign of complication from the humeral head replacement. (Tr.

at 17.)  On May 20, 2015, Dr. Pennington examined plaintiff, finding him alert and oriented, in no acute distress.  (Tr. at 17-18.)  Passive range of motion of the right shoulder was smooth. Right rotator cuff strength was limited due to weakness and pain.  There was tenderness over the right shoulder with positive impingement signs.  The doctor discussed three options: live with it as is, undergo another rotator cuff repair, or undergo superior capsular reconstruction surgery; plaintiff indicated he would weigh his options.  (Tr. at 18.)

The ALJ stated that at the hearing on June 16, 2015, plaintiff testified that he saw some improvement after the second surgery but still had popping and clacking in his shoulder, which affected his confidence in doing daily activities.[16]  However, the ALJ noted that plaintiff was still able to perform a number of activities.  He wrote:

> It is difficult to attribute reported limitations to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(Tr. at 18.)

The ALJ noted that the record contained "treatment notes from a number of other medical professionals and specialists who provided sporadic treatment to the claimant.  All of those notes have been taken into consideration."  (Tr. at 18.)  The ALJ further noted that the RFC conclusions reached by the agency physicians also supported finding that plaintiff was not disabled.  "These opinions deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision)."  (Tr. at 18.)

---

[16]It appears that these statements came from the disability report plaintiff filed just before the hearing.  (Tr. at 307.)

The ALJ concluded: "In sum, the above residual functional capacity assessment is supported by the medical evidence of record. The claimant is capable of light work with some manipulative, postural and environmental limitations." (Tr. at 18.)

Based on this RFC, the ALJ determined at step four that plaintiff could not perform his past work in the warehouse, unskilled/medium work, heavy as plaintiff performed it. (Tr. at 18.) At step five, however, the ALJ determined that plaintiff could perform other jobs as identified by the VE, including the unskilled/light jobs of parking lot cashier (198,000 jobs), self-service cashier (398,000 jobs), and shipping/receiving weigher (187,000 jobs). The ALJ determined that the VE's testimony was consistent with information provided in the Dictionary of Occupational Titles. Based on that testimony, the ALJ concluded that plaintiff could make the adjustment to other work and therefore was not disabled. (Tr. at 19.)

On April 7, 2016, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. at 1, 345), making that decision the final word from the SSA on plaintiff's application. See Bird v. Berryhill, 847 F.3d 911, 912 (7th Cir. 2017). This action followed.

## II. DISCUSSION

### A. Standard of Review

The reviewing court asks whether the ALJ's decision is supported by "substantial evidence," meaning such relevant evidence as a reasonable mind could accept as adequate to support the conclusions at issue. Brown v. Colvin, 845 F.3d 247, 251 (7th Cir. 2016). The court may not, under this deferential standard, decide the facts anew, re-weigh evidence, or substitute its judgment for the ALJ's. Alvarado v. Colvin, 836 F.3d 744, 747 (7th Cir. 2016). In reaching his decision, the ALJ must build a logical bridge from the evidence to his conclusion,

22

but he need not provide a complete written evaluation of every piece of testimony and evidence. <u>Murphy v. Colvin</u>, 759 F.3d 811, 815 (7th Cir. 2014).

Because social security proceedings are non-adversarial, the ALJ has a basic obligation to develop a full and fair record. <u>Beardsley v. Colvin</u>, 758 F.3d 834, 837 (7th Cir. 2014). This duty is enhanced when a claimant appears without counsel, in which case the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. <u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir. 2009). Although pro se claimants must furnish some medical evidence to support their claims, the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information. <u>Id.</u> However, the reviewing court will generally uphold the ALJ's reasoned judgment on how much evidence to gather, even when the claimant lacks representation, and a significant omission is usually required before the court will find that the ALJ failed to assist a pro se claimant in developing the record fully and fairly. <u>Id.</u>

Finally, the reviewing court must ensure that the ALJ applied the correct legal criteria. <u>Allord v. Astrue</u>, 631 F.3d 411, 415 (7th Cir. 2011). The ALJ's failure to comply with the Commissioner's regulations and Rulings on the evaluation of disability claims may constitute legal error requiring remand, without regard to the volume of evidence in support of the factual findings. <u>See, e.g.</u>, <u>Tregler v. Barnhart</u>, 414 F. Supp. 2d 862, 868 (N.D. Ill. 2006). At issue in the present case is SSR 00-4p, 2000 SSR LEXIS 8, which provides that:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is

23

disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Id. at *4-5. The Ruling imposes "an affirmative responsibility" on the ALJ to ask the VE if the evidence he or she has provided conflicts with information provided in the DOT. Id. at *8-9. On review, however, the ALJ's failure to satisfy this affirmative responsibility may be deemed harmless if there is no actual conflict between the VE's testimony and the DOT. Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009). Further, because SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is "apparent," the claimant's failure to identify any such conflicts at the hearing means that he must on judicial review show that the conflict was obvious enough that the ALJ should have picked up on it without any assistance. Id.

**B.    Plaintiff's Assertions of Error**

**1.    Vocational Evidence**

At the outset of the vocational testimony in this case, the ALJ solicited a promise from the VE that he would advise the ALJ of any conflicts with the DOT. (Tr. at 52.) As plaintiff notes, however, the VE then testified that the cashier #211.462-018 job is unskilled/SVP 2 (Tr.

24

at 55),[17] while the DOT classifies it as SVP 3,[18] making it semi-skilled work; the ALJ made no finding that such semi-skilled positions are within plaintiff's RFC.[19] Plaintiff further notes that, in his decision, the ALJ specifically stated: "Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. at 19.) According to plaintiff, this suggests that the ALJ checked the DOT for conflicts and thus should have spotted the VE's error, even though plaintiff did not raise it at the hearing. Finally, plaintiff notes that, while SSR 00-4p imposes an affirmative obligation on the ALJ to ask the VE whether his testimony corresponds with the DOT, the ALJ here asked about "the DOT or other resources" (Tr. at 56), and neither the ALJ nor the VE elaborated on what "other resources" may have been relied upon. (Pl.'s Br. at 19-22.)

The Commissioner responds that, even if the cashier position is too complex for plaintiff to perform,[20] the ALJ also found that plaintiff could work as a shipping/receiving weigher.

_____

[17] Specific Vocational Preparation ("SVP"), as defined in the Dictionary of Occupational Titles, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Jobs with an SVP of 1 may be learned with a short demonstration only; an SVP of 2 requires anything beyond short demonstration up to and including one month; and an SVP of 3 requires one to three months. https://www.onetonline.org/help/online/svp. Unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4. SSR 00-4p, 2000 SSR LEXIS 8, at *8.

[18] See http://www.occupationalinfo.org/21/211462018.html. The other cashier job the VE identified (#211.462-010) is SVP 2. See http://www.occupationalinfo.org/21/211462010.htm.

[19] Based on plaintiff's work experience, it appears the ALJ limited the step five inquiry to unskilled jobs. (See Tr. at 19.) However, the ALJ made no mental RFC finding limiting plaintiff to such work.

[20] In her response, the Commissioner seems to acknowledge that both cashier jobs cited by the VE are SVP 3. However, it appears that, according to the DOT, just one of them is.

(Def.'s Br. at 14.)  This position is, according to the DOT, SVP 2,[21] like the VE said.  (Tr. at 55.)

Plaintiff makes no claim that the 93,500 shipping/receiving weigher jobs identified by the VE

is not a significant number.[22]  Regarding plaintiff's SSR 00-4p argument, the Commissioner

notes that plaintiff articulates no actual conflict between the DOT and the VE's testimony about

the shipping/receiving job, making any error harmless.  (Def.'s Br. at 15.)

In reply, however, plaintiff notes that the DOT describes the "reaching" requirement for

the shipping/receiving weigher job as "occasional,"[23] and the DOT does not distinguish between

reaching overhead and reaching in other directions, or indicate whether reaching with both

arms is required.  See Spriggs v. Colvin, No. 15-cv-1117, 2016 U.S. Dist. LEXIS 178708, at

*10-11 (S.D. Ill. Dec. 27, 2016).  The VE did not alert the ALJ to this discrepancy.  See id. at

*16 ("The ALJ limited plaintiff to no overhead reaching with her left arm.  Despite agreeing to

alert the ALJ to any conflicts between her testimony and information contained in the DOT, the

VE did not tell the ALJ that the DOT does not specify whether reaching includes overhead

reaching, and does not specify whether a job requires the ability to reach with both arms.").

While plaintiff did not raise this issue at the hearing, he was unrepresented, see Barth v. Colvin,

No. 13 CV 7788, 2015 U.S. Dist. LEXIS 154670, at *17-18 (N.D. Ill. Nov. 16, 2015) (noting the

ALJ's heightened duty to resolve apparent conflicts when the claimant is pro se), and the

---

[21]See http://www.occupationalinfo.org/22/222387074.html.

[22]In his decision, the ALJ mistakenly listed 187,000 jobs (Tr. at 19), but the VE cut the number in half when the ALJ added a limitation of no overhead reaching (Tr. at 56).  Plaintiff makes no argument that 93,500 is not a significant number.

[23]The DOT's companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupation Titles, contains more detailed information on the physical demands of jobs.  See https://www.nosscr.org/sco/sco-ocr.pdf, at 95.

Seventh Circuit has cited reaching above shoulder level as the sort of issue the ALJ should explore with a VE. See Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2006) ("It is not clear to us whether the DOT's requirements include reaching above shoulder level, and this is exactly the sort of inconsistency the ALJ should have resolved with the expert's help."); see also Spriggs, 2016 U.S. Dist. LEXIS 178708, at *17 (finding this discrepancy sufficiently obvious to excuse the failure of the claimant's counsel to raise it at the hearing).

The matter must be remanded so the ALJ can obtain appropriate vocational testimony regarding jobs plaintiff can still perform, resolving any conflicts between that testimony and the DOT.[24] Plaintiff's remaining arguments would likely not support remand by themselves, but I nevertheless address them for the sake of completeness.

### 2. Overlooked Medical Evidence

#### a. Surgeries

Plaintiff argues that the ALJ erred in describing his severe shoulder impairment as "status post two surgeries" (Tr. at 15), when he actually had three surgeries plus a manipulation of the joint under anesthesia (Pl.'s Br. at 9). Because the ALJ discussed each of these procedures in formulating RFC (Tr. at 17), any error in his step two statement would be

_____

[24]In reply, plaintiff cites Alaura v. Colvin, 797 F.3d 503, 508 (7th Cir. 2015), where the court stated that the DOT has been "superseded" by the O*NET ("Occupational Information Network"), according to which the shipping/receiving job has an SVP of 4-6, see https://www.onetonline.org/link/summary/43-5111.00, beyond unskilled work. Plaintiff cites no regulation or Ruling requiring the ALJ to check for conflicts with the O*NET, and the statement in Alaura appears to be dicta. Plaintiff may present his arguments regarding the skill level of any identified jobs on remand. Plaintiff also notes that the VE did not explain the basis for his estimates of the number of jobs available in each position, and such information is not included in the DOT. (Pl.'s Br. at 22.) See also Alaura, 797 F.3d at 507 (noting that the DOT does not contain job statistics and questioning where vocational experts get their numbers). He may also contest the basis for the VE's numbers on remand.

harmless.  See Curvin v. Colvin, 778 F.3d 645, 649-50 (7th Cir. 2015) (finding step two error harmless because the ALJ properly considered all of the claimant's impairments, the objective medical evidence, her symptoms, and her credibility when determining RFC).

Plaintiff also faults the ALJ for failing to describe the surgical procedures in sufficient detail (Pl.'s Br. at 9-11), but an ALJ need not provide a complete written evaluation of every piece of evidence and "is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010).  The ALJ did not ignore an entire line of evidence here – he specifically noted each of these procedures, and his failure to discuss all of the surgeons' specific findings would not require remand.  See Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002) ("The ALJ's failure to address these specific findings, however, does not render his decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in his decision."); Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995) (noting that an ALJ's decision need only be sufficient to enable the court to track the ALJ's reasoning and be assured that the ALJ considered the important evidence).  The ALJ acknowledged that the surgeries failed to resolve plaintiff's shoulder problems, that plaintiff faced the prospect of additional procedures (Tr. at 18), and that his ability to use his right arm was significantly limited (Tr. at 16).  Plaintiff fails to explain how the ALJ's failure to discuss the surgeries in more detail impacted the RFC determination.

### b.    Gaps in the Medical Record

Plaintiff contends that the ALJ omitted discussion of medical developments between the order for physical therapy in February 2013 and his surgery in August 2014.  (Tr. at 17; Pl.'s Br. at 11-14.)  As indicated, however, discussion of every piece of evidence is not required, and plaintiff fails to explain how the ALJ's failure to specifically discuss his treatment during this

period impacted the RFC.[25]  The ALJ did not, as plaintiff suggests, characterize his treatment as "sporadic." (Pl.'s Br. at 12.)  Rather, the ALJ noted that the record contains notes from other medical professionals "who provided sporadic treatment."  (Tr. at 18.)  Further, while the ALJ did not specifically discuss all of the x-rays and MRI scans in the record, he did note that the May 4, 2015, CT arthrogram – the most recent imaging – revealed a rotator cuff tear.  (Tr. at 17.)

### 3.    Full and Fair Record

Plaintiff contends that the ALJ failed to develop the record regarding his memory loss after he "coded" during the August 2014 surgery. (Pl.'s Br. at 15.) He cites the medical records noting near respiratory arrest and hypoxemia, and his testimony that he continued to experience memory loss and difficulty expressing himself.  (Pl.'s Rep. Br. at 5; Tr. at 1315, 43-44.)

The ALJ did discuss this issue at the hearing, asking plaintiff about his February 2015 visit with Dr. Trimark, who recommended a brain scan.  (Tr. at 43-44.) The ALJ then located the record of the scan (Tr. at 44), which was unremarkable (Tr. at 1260).  Plaintiff contends that the ALJ should have asked him if he consulted with a neurologist, as Dr. Trimark suggested in April 2015.  However, plaintiff makes no claim and presents no evidence that he actually did so.[26]  See Nelms, 553 F.3d at 1098 (explaining that a claimant must set forth specific, relevant facts – such as medical evidence – that the ALJ did not consider, before the court will find a

---

[25]There does appear to be a gap in plaintiff's treatment with Dr. Pennington.  Plaintiff decided to have surgery in October 2013 (Tr. at 1270), but he did not return to see Dr. Pennington again until March 2014 (Tr. at 1273).

[26]Plaintiff does not, for instance, present medical records from the neurologist in support of a sentence six remand.  See 42 U.S.C. § 405(g), sentence six.

failure to develop the record); <u>Schoenfeld v. Apfel</u>, 237 F.3d 788, 798 (7th Cir. 2001) ("Appellant has failed to point to any specific evidence that the Commissioner excluded, or explain how appellant was prejudiced by the record that was created.").

Plaintiff also contends that the ALJ should have arranged for a consultative medical examination to evaluate the memory problems.  (Pl.'s Br. at 15-16.)  While the ALJ has a heightened duty to make sure the record is fully developed when the claimant is unrepresented, the court will generally defer to the ALJ's judgment on how much evidence is sufficient.  <u>Luna v. Shalala</u>, 22 F.3d 687, 692 (7th Cir. 1994).  It is difficult to see how, given Dr. Trimark's observations, the normal MRI, and plaintiff's apparent failure to follow up with the neurologist, the ALJ abused his discretion in declining to sua sponte order a consultative exam. Nevertheless, because the matter must be remanded based on the vocational issue, plaintiff may on remand request a consultative exam and/or supplement the record with whatever additional evidence exists.[27]

### 4.    Accurate and Logical Bridge

### a.    Failure to Identify Supporting Evidence

Plaintiff attacks as vague and unsupported two paragraphs in the ALJ's decision:

The claimant is still able to perform a number of activities.  It is difficult to attribute reported limitations to the claimant's medical condition, as opposed to other

---

[27] In this section of his brief, plaintiff also contends that the ALJ offered only a cursory discussion of the Listings.  (Pl.'s Br. at 14.)  However, plaintiff makes no attempt to show that he meets or equals any Listing.  Accordingly, the ALJ's failure to say more would also appear to be harmless.  <u>See</u> <u>Knox v. Astrue</u>, 327 Fed. Appx. 652, 655 (7th Cir. 2009) (declining to remand where the claimant presented no medical evidence supporting the position that his impairments met or equaled a particular Listing); <u>Trower v. Colvin</u>, No. 14-C-0917, 2015 U.S. Dist. LEXIS 51534, at *76 (E.D. Wis. Apr. 20, 2015) (finding error regarding the Listings harmless where the claimant did not even attempt to show that she met or equaled any particular Listing).

> reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.
>
> The record contains treatment notes from a number of other medical professionals and specialists who provided sporadic treatment to the claimant. All of those notes have been taken into consideration (Exhibits 1F through 27F).

(Tr. at 18; see Pl.'s Br. at 16-17.) The ALJ failed in this portion of his decision to explain why the medical evidence did not support plaintiff's claims, and simply stating that medical evidence "has been considered" offers the reviewing court no insight into the basis for the ALJ's decision.

The inclusion of vague or boilerplate language in a decision does not require remand so long as the court, reading the decision as a whole, can follow the ALJ's reasoning. See, e.g., Curvin, 778 F.3d at 650; Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013). Earlier in his decision, the ALJ cited medical evidence in support of his conclusion that plaintiff could still perform a range of light work, including the opinion of Dr. Holmes that plaintiff could, despite his ankle impairment, work 40+ hours per week; the occupational therapy assessment indicating that plaintiff could perform light work; and the opinions of the agency consultants that plaintiff could perform a range of light work. The ALJ also discussed plaintiff's reported activities, including preparing meals, doing light housecleaning and laundry, and driving a car. The ALJ acknowledged plaintiff's lack of confidence in performing certain activities due to his shoulder impairment, and he imposed more severe limitations than the consultants suggested, precluding any overhead reaching or more than occasional reaching in other directions with the right arm; he also included postural limitations and precluded exposure to unprotected heights or vibration. Plaintiff points to no medical opinion evidence supporting greater limitations.

On the other hand, the ALJ did not specify the "other reasons" for plaintiff's limited activities. Plaintiff's solid work history – 30 years at the same job – would appear to enhance

the credibility of his claim that his limited activities related to his medical conditions rather than, say, indolence.  See Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015).  On remand, the ALJ should either specify the "other factors" that outweigh plaintiff's claims or indicate that, even accepting plaintiff's statements, he remains able to work.  See Engstrand v. Colvin, 788 F.3d 655, 660 (7th Cir. 2015) ("[A]lthough we defer to an ALJ's credibility finding that is not patently wrong, an ALJ still must competently explain an adverse-credibility finding with specific reasons supported by the record.  An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.") (internal citations and quote marks omitted).

### b.    Credibility

Plaintiff faults the ALJ for failing to explain why his statements were "not entirely credible."  (Tr. at 16.)  Plaintiff notes his extensive efforts to obtain treatment for his shoulder, including physical therapy and multiple surgeries, which bolsters his complaints of pain and weakness.  (Pl.'s Br. at 17-18.)  However, the ALJ did not cite failure to seek treatment as a strike against plaintiff's credibility.

Plaintiff also faults the ALJ for focusing on the agency consultants' RFC determinations, overlooking their findings that plaintiff's statements regarding his shoulder were generally consistent with the objective medical evidence.[28]   (Pl.'s Br. at 17-18, 19; Tr. at 77, 92).  However, credibility findings are reserved for the ALJ, e.g., Kelley v. Sullivan, 890 F.2d 961, 964 (7th Cir. 1989), and should be based on the entire record, not a particular doctor's opinion.  In any event, to the extent that these doctors accepted plaintiff's statements as consistent with

---

[28]The second consultant found plaintiff's statements regarding his ankle inconsistent with the objective medical evidence.  (Tr. at 92.)

the medical evidence, they also found him capable of light work.

Plaintiff further faults the ALJ for not specifically asking whether he still claimed disabling limitations related to his ankle. (Pl.'s Br. at 18.) But the ALJ asked plaintiff why he could no longer work, and in response plaintiff mentioned only his shoulder impairment and limited work experience. (Tr. at 39-40.) The ALJ also asked plaintiff whether he had pain and where; plaintiff responded in the shoulder. (Tr. at 40.) And, the ALJ asked plaintiff if he had any trouble walking, and plaintiff responded: "No. No, I don't." (Tr. at 47.)

Finally, plaintiff faults the ALJ for noting his full range of motion and lack of symptoms in other extremities. (Pl.'s Br. at 19; Tr. at 17.) However, the ALJ was required to consider whether plaintiff had any such limitations. See, e.g., Arnett v. Astrue, 676 F.3d 586, 591-92 (7th Cir. 2012) (stating that the ALJ must consider the combined effects of all impairments, including those that are not severe).

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of May, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge